Kathleen PATCHEN and Barbara Dickens–Sumner, individually and on behalf of all others similar situated, Plaintiffs,

v.

GOVERNMENT EMPLOYERS INSURANCE COMPANY, GEICO Casualty Company, GEICO Indemnity Company, GEICO General Insurance Company, Defendants.

No. 10–cv–2056 (ADS)(AKT).

United States District Court,
E.D. New York.

Jan. 7, 2011.

Locks Law Firm PLLC, by Andrew Bell, Esq., of Counsel, New York, NY, for Plaintiffs.

Brecher Fishman Pasternack Walsh Tilker & Ziegler, P.C., by Brian Wayne Tilker, Esq., Vincent L. Gonzalez, Esq., of Counsel, New York, NY, for Plaintiffs.

Rivkin, Radler & Kremer, by Evan H. Krinick, Esq., Michael P. Versichelli, Esq., Michael P. Welch, Esq., of Counsel, Uniondale, NY, for Defendants.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This putative class action arises out of the defendant auto insurance company's specification of less expensive and allegedly inferior auto parts in its repair estimates for damaged vehicles. The defendants, Government Employers Insurance Company, GEICO Casualty Company, GEICO Indemnity Company, and GEICO General Insurance Company (consistent with both parties' usage, the Court refers to these entities collectively as "GEICO" or "the defendant"), presently move to dismiss all of the plaintiffs' claims. For the reasons that follow, the Court grants this motion with partial leave to replead.

## I. BACKGROUND

The plaintiffs in this case, Kathleen Patchen and Barbara Dickens–Sumner, are both New York vehicle owners whose respective vehicles were damaged in separate auto accidents. Patchen owns a Hyundai Elantra, a compact car, which was damaged in a collision with another vehicle on February 13, 2010, while Dickens–Sumner owns a Toyota Sienna, a minivan, which was damaged when it hit a stationary object on November 14, 2009. At the time of her accident, Dickens–Sumner was a GEICO insured, and pursuant to her insurance contract, GEICO was to pay the cost of repairing her mini-van. Patchen was also a GEICO insured at the time of her accident, but the cost of repairs to her car was ultimately not paid under her own policy, but under the policy covering the other car involved in her accident. By coincidence, that policy was also issued by GEICO.

Shortly after their respective accidents, both Patchen and Dickens–Sumner took their vehicles to auto shops, where insurance adjusters for the defendant GEICO estimated the cost of repairs to their respective automobiles. Based on these estimates, GEICO then issued a check to each of the plaintiffs in the total amount of each adjuster's estimate. Check in hand, each plaintiff was then free to have the repairs done at the estimated price; to request different repairs; or to pocket the money.

The crux of the plaintiffs' claims is that the estimates by the GEICO claims adjusters were too low, and that the checks that GEICO issued did not fully compensate them for the damage to their vehicles. According to the plaintiffs, this was for a singular reason: In each case, the claims adjuster prepared his estimate using prices for "non-OEM crash parts" rather than "OEM crash parts". In automobile parlance, "crash parts" are plastic or metal components of a vehicle exterior, including bumpers, fenders, and doors, that are designed to absorb energy in an accident and often must be replaced after a collision. "OEM" crash parts are manufactured by a vehicle's "original equipment manufacturer"—the same manufacturer that originally built the vehicle. "Non–OEM" crash parts are manufactured by another company. Thus, GEICO priced into its estimate for Patchen's Toyota several replacement crash parts that were not manufactured by Toyota. Similarly, in estimating the cost of repairing Dickens–Sumner's Hyundai, GEICO specified several non-Hyundai crash parts.

The benefit of specifying non-OEM parts is that they are almost always less expensive than the parts made by the original vehicle manufacturer. This provides a cost savings to the insurer and, arguably, to policy holders to whom this savings may be passed on by lower premiums. However-

er, according to the plaintiffs, the problem with regard to specifying these non-OEM parts is that they are universally inferior. The plaintiffs contend that GEICO was obligated to pay the cost of repairing their vehicles with genuine OEM parts. When GEICO paid the cost of repairing the plaintiffs' vehicles with inferior non-OEM parts, the plaintiffs (and the members of the putative plaintiff class) were allegedly damaged by the difference in value between the OEM and non-OEM parts.

Patchen and Dickens–Sumner received their payment checks from GEICO in February 2010 and November 2009, respectively, and on May 5, 2010, the plaintiffs commenced this lawsuit. The plaintiffs claim that they were undercompensated by GEICO, and assert causes of action on behalf of themselves and a putative class of similarly situated plaintiffs for (1) breach of contract, (2) unfair and deceptive trade practices under N.Y. Gen. Bus. Law § 349 *et seq.*, (3) unjust enrichment, (4) moneys had and received, and (5) "declaratory and injunctive relief."

On July 26, 2010, GEICO moved to dismiss all of the plaintiffs' claims pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a valid claim. GEICO primarily asserts that all of the plaintiffs' claims rely on the premise that non-OEM parts are universally inferior to OEM parts, and that given the relevant New York State regulations on the subject, the plaintiffs have not alleged facts that support this conclusion. The plaintiffs oppose the defendant's motion.

## II. DISCUSSION

### A. Standard on a Motion to Dismiss

Under the now well-established *Twombly* standard, a complaint should be dismissed only if it does not contain enough allegations of fact to state a claim for relief

that is "plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). The Second Circuit has explained that, after *Twombly,* the Court's inquiry under Rule 12(b)(6) is guided by two principles. *Harris v. Mills,* 572 F.3d 66 (2d Cir.2009) (quoting *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)).

"First, although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions' and 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Id.* (quoting *Iqbal,* 129 S.Ct. at 1949). "'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss' and '[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (quoting *Iqbal,* 129 S.Ct. at 1950). Thus, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and ... determine whether they plausibly give rise to an entitlement of relief." *Iqbal,* 129 S.Ct. at 1950.

The fact that the plaintiffs have asserted putative class claims does not affect the Court's analysis of the validity of the individual plaintiffs' claims. *See, e.g., In re Morgan Stanley Mortg. Pass-Through Cert. Litig.,* No. 09–cv–2137, 2010 WL 3239430, *4 (S.D.N.Y. Aug. 17, 2010) ("even named plaintiffs who represent a class must allege and show that they personally have been injured," quoting *Lewis v. Casey,* 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)).

**B.  As to the Plaintiffs' Cause of Action for Breach of Contract**

The plaintiffs' first cause of action is for breach of GEICO's standard auto insur-ance contract. According to the plaintiffs, this contract obligated GEICO to pay them the cost of repairing their vehicles with OEM crash parts. The plaintiffs contend that, when GEICO made payments to them based on the use of non-OEM parts, this breached the contract. GEICO has moved to dismiss this claim in its entirety.

As a preliminary matter, GEICO contends that the plaintiff Patchen—though not the plaintiff Dickens–Sumner—has no standing to assert a breach of contract claim against it. GEICO notes that it compensated Patchen not pursuant to her own GEICO policy, but pursuant to the GEICO policy on the other car involved in her accident. Thus, GEICO contends that this transaction was not governed by a contract between Patchen and GEICO, and Patchen has no privity of contract with GEICO on which to base a breach of contract claim. For their part, the plaintiffs do not deny that Patchen was compensated pursuant to a third party's contract with GEICO, but they assert that Patchen nevertheless has standing to assert a breach of contract claim against GEICO as a third party beneficiary of that contract.

■  Under N.Y. Insurance Law § 3420, when a plaintiff seeks payment from a third party's insurer, the plaintiff must first proceed against that third party before suing the insurer. *Lang v. Hanover Ins. Co.,* 3 N.Y.3d 350, 354, 820 N.E.2d 855, 787 N.Y.S.2d 211 (N.Y.2004) ("Insurance Law § 3420 therefore grants an injured party a right to sue the tortfeasor's insurer, but only under limited circumstances—the injured party must first obtain a judgment against the tortfeasor, serve the insurance company with a copy of the judgment and await payment for 30 days. Compliance with these requirements is a condition precedent to a direct action against the insurance company."):

*see also Selchick v. Automobile Ins. Co. of Hartford, Connecticut,* 32 A.D.3d 924, 822 N.Y.S.2d 575 (2d Dep't 2006) (applying *Lang* in the context of an automobile liability insurance policy). GEICO's standard auto insurance policy reflects this law, stating:

No suit will lie against [GEICO]: ...

(b) until the amount of the *insured's* obligation to pay has been finally determined, either:

(i) by a final judgment against the *insured* after actual trial; or

(ii) by written agreement of the *insured,* the claimant and us.

(Compl., Ex. A at 6 (emphasis in original).)

■ Here, there is no allegation that Patchen has obtained an unsatisfied judgment against the other individual involved in her auto accident. Nor is there a basis in the present case for ignoring the directive of the Court of Appeals in *Lang* that a plaintiff must proceed against an insured before moving against his insurer. Thus, the Court agrees with GEICO that, at present, Patchen has no standing to pursue a breach of contract claim against GEICO. The Court therefore grants the defendant's motion to dismiss Patchen's breach of contract claim.

By contrast, Dickens–Sumner's breach of contract claim does not suffer from this deficiency, so the Court will now consider its merits.

The parties agree that GEICO has a standard auto insurance contract that all policy holders enter into with GEICO. The heart of GEICO's obligation to compensate insureds for damage to their vehicles is provided for in a short provision of that standard contract, which states:

[GEICO] will pay for *collision loss* to the *owned* or *non-owned auto* for the amount of each *loss* less the applicable deductible.

(Compl., Ex. A at 9 (emphasis in original).) Elsewhere in the contract, "loss" is defined as "direct and accidental loss of or damage to ... the auto ...," and "collision loss" is defined as "loss" caused by collision between a vehicle and another object. Under these terms, there is no dispute here that Dickens–Sumner has alleged damage to her vehicle for which GEICO must compensate her.

■ Rather, the parties dispute whether GEICO must pay to repair Dickens–Sumner's vehicle with OEM crash parts, or whether specification of non-OEM repair parts is sufficient. The text of the contract itself makes no mention of OEM and non-OEM crash parts. The contract provides only that GEICO's liability for loss will not exceed the cost of replacing damaged parts "with other of like kind and quality". (*Id.* at 10.) However, helpful in this regard is the New York State Insurance Law, which the parties agree supplements the parties' contract "as though written into it." *See Trizzano v. Allstate Ins. Co.,* 7 A.D.3d 783, 785, 780 N.Y.S.2d 147 (2d Dep't 2004) (quoting *Salzman v. Prudential Ins. Co. of America,* 296 N.Y. 273, 277, 72 N.E.2d 891 (N.Y.1947)). New York State Insurance Law explicitly discusses the specification of non-OEM crash parts, and provides in pertinent part:

(5) If the insurer's repair estimate is based upon the use of any non-OEM crash part: ...

(iii) the crash part shall equal or exceed the comparable OEM crash part in terms of fit, form, finish, quality and performance....

11 N.Y.C.R.R. 216.7(b)(5).

It is the plaintiffs' basic claim that, while it is technically permissible to compensate insureds for the price of non-OEM parts, doing so is a breach of contract because *no* non-OEM part is equal to or better than

an OEM part. Consistent with this theory, the plaintiffs allege no facts about the condition of the non-OEM parts listed in Dickens–Sumner's estimate, or about the manufacturers of those particular non-OEM parts. Indeed, except for the fact that the plaintiffs attach to the complaint the repair estimate for Dickens–Sumner's minivan, the plaintiffs do not even indicate what non-OEM repair parts were specified for Dickens–Sumner's vehicle. Rather, the plaintiffs focus solely on alleging facts that support the conclusion that *all* non-OEM parts are inferior, regardless of the part or the manufacturer. To this end, the plaintiffs allege that non-OEM parts are universally inferior because:

1. Non–OEM parts are "reverse engineered", in that they are designed "without the benefit of the vehicle manufacturer's specifications in terms of material, dimensions, heat treatments, and tolerances, ... the original manufacturers' design intent, ... [or] OEM design and material updates." (Compl., ¶¶ 18–20.)

2. Non–OEM parts "lack safeguards inherent in the large scale production used by the original vehicle manufacturers." (*Id.*, ¶ 21.)

3. A 1999 Consumer Reports study found that non-OEM fenders were "inferior to OEM crash parts." (*Id.*, ¶ 22.)

4. A 1999 study by the National Collision Marketing Institute found that non-OEM parts fit vehicles at lower rates than OEM parts; that non-OEM parts were delivered with damage more often than OEM parts; and that "only 14% of repair shops were satisfied with [non-OEM parts], compared with 100% for OEM crash parts." (*Id.*, ¶ 23.)

5. In January 2010, the national director for the Society of Collision Repair Specialists "outlined how certain [non-OEM parts] were made of lower quality steels and other materials that could compromise their effectiveness in a crash." (*Id.*, ¶ 26.)

6. In January 2010, the Auto Body Parts Association, "who represents more than 150 manufacturers, distributors and suppliers" of non-OEM parts, notified these manufacturers, distributors, and suppliers that, before selling non-OEM parts, they should ensure that test evidence shows that the parts will perform as well as OEM parts. (*Id.*, ¶ 27.)

7. In January 2010, GEICO stopped specifying in its estimates non-OEM "bumper reinforcements, brackets, and energy absorbers," (*Id.*, ¶ 29.)

8. In February 2010, the Certified Auto Parts Association established a new certification standard to ensure that non-OEM bumper parts were safe, following a finding that non-OEM bumper parts had "serious deficiencies in mechanical properties such as strength and metal hardness, material thickness, and fit." (*Id.*, ¶ 30.)

9. In February 2010, the New York State Auto Collision Technicians Association "called on all insurers in New York who specify the use of untested, unqualified, non-OEM compliant crash parts to take corrective action immediately." (*Id.*, ¶ 31.)

10. In February 2010, NSF International, "an American National Standards Institute (ANSI)-accredited standards writing organization", announced a new certification program for non-OEM parts. (*Id.*, ¶ 33.)

11. In February 2010, the Automotive Service Association wrote to the

National Highway Traffic Safety Administration to express concern about the lack of regulation of the use of non-OEM repair parts. (*Id.* ¶ 34.)

The plaintiffs assert that these allegations are sufficient to show that all non-OEM parts are inferior to all OEM parts. Thus, even though Dickens–Sumner has alleged no facts concerning the actual non-OEM parts specified for her vehicle, the plaintiffs contend that she has nevertheless stated a claim for breach of contract. In opposition, GEICO contends that, particularly given New York's regulation of the specification of non-OEM parts in repair estimates, the plaintiffs have failed to allege facts showing that it is plausible that all non-OEM parts are inferior to OEM parts.

This Court is not the first to confront this issue. The most prominent decision on point, and in the Court's view, the most helpful, is the decision of the Illinois Supreme Court in *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d 100, 296 Ill.Dec. 448, 835 N.E.2d 801 (Ill.2005). *Avery* was a class action brought by auto policy holders against an auto insurer, in which the plaintiffs sought breach of contract damages based on the defendant's specification of non-OEM parts in the plaintiffs' automobile repair estimates. In support of their claim, the plaintiffs sought to prove that all non-OEM parts were inferior to OEM repair parts. *Id.* at 112, 296 Ill.Dec. 448, 835 N.E.2d 801 ("Under plaintiffs' view, non-OEM parts could never satisfy State Farm's 'like kind and quality' obligation."). At the trial, the plaintiffs succeeded on this theory, and the billion-dollar damage award that the plaintiffs then received was later largely upheld by an intermediate appellate court.

However, in its decision in *Avery*, the highest court in Illinois overturned the jury's verdict in its entirety. In dismissing the plaintiffs' breach of contract claim, the court found, first, that the parties' contracts contemplated the specification of non-OEM crash parts for repairs. Thus, even admitting that specification of certain non-OEM parts may have been improper, the court held that the "specification of non-OEM parts, by itself, cannot constitute a breach of the [promise to pay to restore a damaged vehicle to its pre-loss condition]." *Id.* at 138, 296 Ill.Dec. 448, 835 N.E.2d 801. The court reasoned that the fact that the contract itself allowed the insurer to specify non-OEM crash parts made it impossible for the plaintiff class to pursue a breach of contract claim premised on the universal inferiority of non-OEM parts. Rather, the court held that under the terms of the parties' contract, "the insured *agrees* that the 'pre-loss condition' promise may be met by specifying non-OEM parts." *Id.* at 144, 296 Ill.Dec. 448, 835 N.E.2d 801 (emphasis in original).

The highest court of Massachusetts reached a similar conclusion in *Roth v. Amica Mut. Ins. Co.*, 440 Mass. 1013, 796 N.E.2d 1281 (Mass.2003). In that case, the plaintiff also alleged the universal inferiority of non-OEM crash parts, in spite of a state regulatory scheme permitting the specification of non-OEM parts. The Massachusetts regulation, like New York's regulation, provided that non-OEM parts could be specified only after meeting certain requirements, including that the parts be of like kind and quality to OEM parts. *Id.*, 440 Mass. at 1014, 796 N.E.2d 1281. Affirming a lower court's grant of partial summary judgment to the defendant, the *Roth* court stated:

> [The plaintiff] argued below, as she argues on appeal, that all non-OEM parts are inherently inferior to OEM parts in every circumstance. Her global generalization flies in the face of common

sense, common experience, and contrary conclusions reached by the Legislature, the division, and the board. . . . We decline Roth's invitation to consider this detailed regulatory scheme, which unambiguously allows for use of non-OEM parts, as intended only for some distant future when non-OEM parts may be as good as OEM parts. The Legislature has decided that, in many instances, they already are.

*Id.*

Nevertheless, other courts have found that claims premised on the alleged universal inferiority of non-OEM repair parts may be tenable. In particular, the plaintiffs cite to decisions from intermediate appellate courts in Missouri, California, and Florida, which hold either explicitly or implicitly that a plaintiff may maintain a breach of contract claim based on the assertion that all non-OEM parts are inferior to OEM parts. *See Smith v. American Family Mut. Ins. Co.*, 289 S.W.3d 675 (Mo.App.W.D.2009) (reinstating a jury verdict in favor of the plaintiff class, and stating that "[t]he Plaintiffs presented sufficient evidence for a reasonable juror to conclude that [non-OEM] parts are not of like kind and quality to OEM parts. . . ."); *Lebrilla v. Farmers Group. Inc.*, 119 Cal. App.4th 1070, 16 Cal.Rptr.3d 25 (Cal. App.4th Dist.2004) (granting class certification to a class asserting that all non-OEM parts are inferior to OEM parts, and stating that the court "do[es] not wish to speculate on whether plaintiffs will be able to prove their case."); *Sweeney v. Integon General Ins. Corp.*, 806 So.2d 605 (Fla. App. 4th Dist.2002) (Reversing the dismissal of a class action claim that was premised on the universal inferiority of non-OEM parts, and noting that the lower court "impermissibly assum[ed] a lack of proof as to the merits of the claims.").

In this case, the Court finds the decisions of the Illinois and Massachusetts high courts to be persuasive. As in Massachusetts, the New York State legislature has chosen to explicitly permit and regulate the specification of non-OEM crash parts in repair estimates. Thus, as the court found in *Roth*, this Court declines to find it plausible that the detailed regulation by the State of the use of these non-OEM parts is mooted by the parts' universal inferiority. Moreover, the parties acknowledge that New York's insurance regulations permitting the specification of non-OEM crash parts are directly incorporated into the parties' insurance contract. Thus, as was the case in *Avery*, the plaintiffs here cannot plausibly contend that the defendant breached its contract by specifying non-OEM parts, when this act is expressly permitted under the parties' agreement.

In making this determination, the Court recognizes that it is the plaintiffs' contention that, while the parties' contract contemplates the specification of non-OEM parts, it is impossible for non-OEM parts to match OEM parts in quality. However, this view is obviously not shared by the New York State legislature. Had the legislature found that non-OEM parts could not be sufficient and adequate as replacement parts, presumably, with reasonable certainty, it would have simply banned the use of these parts. *See also Roth*, 440 Mass. at 1014, 796 N.E.2d 1281 ("We decline [the plaintiff's] invitation to consider this detailed regulatory scheme, which unambiguously allows for use of non-OEM parts, as intended only for some distant future when non-OEM parts may be as good as OEM parts.") As for the decisions of the intermediate state appellate courts in *Smith, Lebrilla,* and *Sweeney,* the Court finds that these cases are distinguishable primarily on the ground that none of these courts were applying the

*Twombly* plausibility standard for pleading. However, the Court also finds that, to the extent these cases are not distinguishable, they are not binding on this Court.

Moreover, even without considering New York's regulatory scheme, the Court still does not find it plausible that *all* non-OEM parts are inferior to OEM parts. The plaintiffs have alleged facts suggesting that many—even most—non-OEM parts are inferior to OEM parts. However, these same alleged facts also show that there are also adequate non-OEM parts. For example, the plaintiffs cite to a study suggesting that non-OEM parts produce lower satisfaction rates than OEM parts. However, this study also states that some people *are* satisfied with non-OEM parts. (See Compl., ¶ 23 ("14% of repair shops were satisfied with [non-OEM parts]".)) Similarly, the plaintiffs' allegations concerning trade groups demonstrate that these groups were concerned about the quality of non-OEM parts, but also that they believe that non-OEM parts are, at times, sufficient.

In the Court's view, the plaintiffs' strongest allegation of fact showing the universal inadequacy of non-OEM parts is that the non-OEM parts are "reverse engineered." Thus, they are built by manufacturers who do not have access to the original product design specifications. However, even in this situation, the Court finds that it is not plausible that, among the dozens of various replacement parts at issue, manufactured by the scores of non-OEM manufacturers for the hundreds of vehicle models sold in the United States, there are no parts that have been designed to equal their OEM counterparts.

Therefore, the Court grants the defendant's motion to dismiss the plaintiff Dickens–Sumner's cause of action for breach of contract. The Court notes that it makes this determination without commenting on the validity of any *individual* breach of contract claim that Dickens–Sumner should later assert, based on facts showing that the actual parts specified for her vehicle repair were inadequate.

## C. As to the Plaintiffs' Cause of Action for Violation of New York General Business Law § 349 *et seq.*

██ The plaintiffs also assert against GEICO a cause of action for violation of New York General Business Law § 349 *et seq.*, New York's consumer protection statute. To prevail on a consumer protection law claim, a plaintiff must prove: "first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29, 731 N.E.2d 608, 709 N.Y.S.2d 892 (N.Y.2000) (internal citations omitted).

██ Here, the plaintiffs allege not only that GEICO specified non-OEM parts in its repair estimates, but also that GEICO actively corralled claimants into "captive" repair shops that would recommend substandard non-OEM replacement parts, while failing to inform claimants that non-OEM parts were inferior. In the Court's view, the plaintiffs' allegations describe conduct that is at least arguably both consumer-oriented and materially misleading. However, the Court need not address these elements in detail, as the plaintiffs fail to allege facts that satisfy the third element, actual injury from the defendant's alleged conduct. As discussed above, the plaintiffs assert no facts to show that the non-OEM parts specified for their vehicles were deficient, but rather attempt to show that non-OEM parts are inferior without exception. The Court has found that this theory of universal inferiority is not plausi-

ble. As such, the Court cannot conclude that the plaintiffs were injured by the specification of non-OEM parts in their vehicles. The Court thus grants the defendant's motion to dismiss the plaintiffs' GBL § 349 *et seq.* claim.

### D. As to the Plaintiffs' Causes of Action for Unjust Enrichment and Moneys Had and Received

Based on these same alleged facts, the plaintiffs further assert against GEICO the closely-related causes of action of unjust enrichment and moneys had and received. GEICO has moved to dismiss these causes of action as well.

Under New York law, an unjust enrichment claim requires a showing that "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir.2004) (citing *Clark v. Daby*, 300 A.D.2d 732, 751 N.Y.S.2d 622, 623 (3d Dep't 2002)). A claim for moneys had and received requires a similar showing that "(1) defendant received money belonging to plaintiff; (2) defendant benefitted from the receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money." *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat. Ass'n*, 731 F.2d 112, 125 (2d Cir.1984).

However, neither a claim for unjust enrichment nor a claim for moneys had and received—both of which are quasi-contract causes of action—will lie when a contract governs the relationship between a plaintiff and a defendant. *See Beth Israel Medical Center v. Horizon Blue Cross and Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 586–87 (2d Cir.2006); *Egnotovich v. Katten Muchin Zavis & Roseman LLP*, 55 A.D.3d 462, 464, 866 N.Y.S.2d 156 (1st Dep't 2008). Nevertheless, if there is a genuine dispute as to whether a contract governs the parties' relationship, then a plaintiff may proceed in the alternative on both contract and quasi-contract claims. *See, e.g., Wilmoth v. Sandor*, 259 A.D.2d 252, 254, 686 N.Y.S.2d 388 (1st Dep't 1999) ("Where, as here, a bona fide dispute as to the existence or application of a contract is demonstrated, a plaintiff generally will not be required to elect his or her remedies.") (internal quotations and citations omitted).

In this case, the parties agree that the relationship between GEICO and Dickens–Sumner was governed by a valid contract. Thus, Dickens–Sumner may not proceed on either quasi-contract cause of action, and the Court grants the defendant's motion to dismiss Dickens–Sumner's claims for unjust enrichment and moneys had and received.

As for Patchen, the Court has already found that she presently has no standing to proceed on a breach of contract claim against GEICO, and even should Patchen cure her deficiencies in standing, there remains a genuine dispute here as to whether a contract governs her relationship with GEICO. Thus, unlike Dickens–Sumner, Patchen is not barred by her breach of contract claim from proceeding on quasi-contract claims. Nevertheless, both unjust enrichment and moneys had and received require allegations of fact showing that the defendant benefitted at the improper expense of the plaintiff. As discussed above, the Court finds the plaintiffs' allegations that they were harmed by the specification of non-OEM parts to be insufficient. The Court therefore grants the defendant's motion to dismiss Patchen's unjust enrichment and moneys had and received claims.

**E. As to the Plaintiffs' Cause of Action for "Declaratory and Injunctive Relief"**

Finally, the plaintiffs seek a declaratory judgment that "[GEICO] must restore Plaintiffs' and Class members' damaged vehicles to pre-loss condition using OEM crash parts or parts of like kind and quality of OEM crash parts." (Compl., ¶ 95.) In addition, the plaintiffs request an injunction enjoining GEICO from specifying non-OEM parts "unless and until the [non-OEM parts] are of like kind and quality as to OEM crash parts." (*Id.*, ¶ 96.)

Under the New York Insurance Law, GEICO is obligated to specify crash parts that are either (1) OEM parts or (2) non-OEM parts that "equal or exceed the comparable OEM crash part in terms of fit, form, finish, quality and performance." 11 N.Y.C.R.R. 216.7(b)(5). In requesting a declaratory judgment, the plaintiffs essentially ask the Court to repeat this statutory directive. The Court declines to do so, and grants the defendant's motion to dismiss this cause of action. As for the plaintiffs' request for injunctive relief, the plaintiffs presently have no valid causes of action pending before the Court, and therefore have no basis for injunctive relief.

## III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the defendant GEICO's motion to dismiss the plaintiff Kathleen Patchen's cause of action for breach of contract for lack of standing is granted; and it is further

**ORDERED** that the defendant GEICO's motion to dismiss the plaintiff Barbara Dickens–Sumner's cause of action for breach of contract is granted; and it is further

**ORDERED** that the defendant GEICO's motion to dismiss the plaintiffs' cause of action for violation of the New York Consumer Protection Law, GBL § 349 *et seq.* is granted; and it is further

**ORDERED** that the defendant GEICO's motion to dismiss the plaintiff Barbara Dickens–Sumner's causes of action for unjust enrichment and moneys had and received is granted; and it is further

**ORDERED** that the defendant GEICO's motion to dismiss the plaintiff Kathleen Patchen's causes of action for unjust enrichment and moneys had and received for failure to state a claim is granted; and it is further

**ORDERED** that the defendant GEICO's motion to dismiss the plaintiffs' **claims** for declaratory and injunctive relief is granted; and it is further

**ORDERED** that the Clerk of the Court is respectfully directed to close this case.

**SO ORDERED.**